UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM POE, JR.,

      Plaintiff,

v.

OGEMAW COUNTY, KAY NORMAN,
and BRIAN OSIER,

      Defendants.

Case No. 19-10008
Honorable Laurie J. Michelson
Magistrate Judge Patricia T. Morris

_____

**OPINION AND ORDER
ADOPTING IN PART REPORT AND RECOMMENDATION [30] AND
GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS AND MOTION FOR SUMMARY JUDGMENT [20]**

_____

Prison inmate William Poe, Jr. alleges that a jail employee touched him sexually and made inappropriate comments to him in the jail's kitchen. Poe brought a civil rights lawsuit against that employee as well as the jail's administrator and the municipality where the jail is located.

Defendants filed a motion to dismiss and motion for summary judgment. Magistrate Judge Patricia T. Morris issued a thorough report and recommendation, and both sides then filed objections. The Court considers them here.

**I.**

Poe was incarcerated at the Ogemaw County Correctional Facility ("Facility") at the time of the events here, which spanned from about March 7 through June 28, 2017. (ECF No. 1, PageID.6, 8.) Defendant Kay Norman was an employee who worked in the kitchen and Defendant Brian Osier was the facility's jail administrator. (ECF No. 1, PageID.7.) Based on Norman's recommendation, Poe became an inmate trustee who worked in the kitchen. (ECF No. 1, PageID.8.)

Poe (proceeding pro se) details numerous salacious allegations in his complaint, and the Court views the facts in the light most favorable to Poe at this stage. According to Poe, Norman eventually became "very touchy and started making sexual[] [gestures] towards" him. (*Id.*) Although Poe did not consent to the touching and told Norman multiple times to stop, she ignored his demands. (*Id.*) Norman also made sexual comments to Poe about certain foods. (*Id.*) On one occasion in a kitchen pantry, Norman "walked in behind Plaintiff Poe[,] grabbed [his] buttocks[,] pulled him close[,] slid her hand in front of plaintiff[,] and [r]ubbed across [his] penis area." (*Id.*) Norman then said to Poe, "[N]ice, you know what a ol' lon[el]y lady could do with that." (*Id.*) Poe rebuffed Norman, pulling away and telling her to stop because it was "wrong and we'll get in trouble." (ECF No. 1, PageID.9.)

According to Poe, this sort of behavior continued on other occasions in the kitchen area. (*Id.*) In particular, Poe alleged one instance when Norman "pushed Plaintiff Poe against the can rack in the dry food pantry," "placed [his hand] on her breast as she caressed [his] penis into an er[]ection," and said, "You need to relax and loos[en] up[;] we aren't going to get caught." (*Id.*) She then lifted her shirt and told him, "[T]hese are all yours when you are ready" before walking out of the pantry. (*Id.*)

A few days later, Norman again propositioned Poe. They were alone together in a kitchen freezer when Norman "took her hand [and] rubb[ed] inside her pants" and then offered to have sex with Poe. (*Id.*) After Poe told her "No," she pushed him "to [the] shelf[,] putting her hand inside his pants." (*Id.*) As Poe attempted to leave the freezer, Norman grabbed his arm and asked, "Why aren't you lo[osen]ing up[?] I promi[s]e you no one will find out." (*Id.*) Poe responded, "Not now." (*Id.*)

Poe's complaint also details numerous gifts he received from Norman, such as candy, coffee, and her prescription medication. (ECF No. 1, PageID.10.) On Poe's birthday, Norman called the kitchen phone from her home and made a lewd comment about having sex as a birthday present. (*Id.*) Poe responded that he was not interested. (*Id.*)

Poe confided in another inmate trustee, who advised that he reach out to Lieutenant Osier, the jail administrator. (*Id.*) So Poe sent multiple email "kites" (or messages) to Osier saying that they needed to talk. (*Id.*) Soon after, Osier spoke in person with Poe, who reported that Norman was "getting very friendly with her mouth and body lan[g]uage towards him and too touchy." (ECF No. 1, PageID.11.) Osier laughed at Poe's accusation and said, "[L]isten[,] she prob[abl]y means no harm and if she was doing all this you['re] not going to say you['re] not enjoying it." (*Id.*) Osier added, "You'll be fine[;] not the first inmate she's gotten fresh with." (ECF No. 1, PageID.12.) Osier took no action, so Poe made sure he was never alone again in a room with Norman. (ECF No. 1, PageID.11.) The situation caused him to feel "very worthless and useless." (*Id.*)

Defendants dispute this story almost entirely. Norman, who says she has known Poe since the time she was an assistant in his third-glass class, claims that Poe never complained about her behavior. (ECF No. 20-9, PageID.163.) Poe's allegations "regarding sexually inappropriate conduct by me are entirely untrue," Norman swears in an affidavit. (*Id.*) Norman flatly denies that she ever "engaged in any sexual misconduct with Plaintiff Poe, or any other inmate, either verbally or physically." (ECF No. 20-9, PageID.164.) Additionally, she avers that she never called Poe on the kitchen phone on the day alleged (which she did not have off from work) or any other time. (*Id.*) She overheard Poe's conversation with Osier, which related to Poe's facility placement and not "any complaints of sexually inappropriate conduct by anyone." (*Id.*)

Osier also denies Poe's allegations. Defendants' motion includes the texts of several kites from Poe to Osier, which Osier found "vague." (ECF No. 20-12, PageID.178.) Poe wrote on May 10, 2017, "NEED 2 TALK 2 U PRIVATLY PLZ THANKS" and the next day, "PLZ COME C ME SO WE CAN DISCUSS SOME THINGS THANKS." (ECF No. 20-18, PageID.388.) Osier states in his affidavit that none of Poe's messages to him involved "any allegations that Kay Norman had engaged in any sexually inappropriate conduct with Plaintiff or any other inmate." (ECF No. 20-12, PageID.178.)

On May 12, Osier responded in writing to Poe, "Ok," and then he spoke in person with Poe in the kitchen. (ECF No. 20-12, PageID.178–179.) Like Norman, Osier swears that Poe did not complain about sexually inappropriate conduct during that conversation. (*Id.*) Rather, Osier says, Poe and Osier spoke about whether Poe could remain in the facility rather than switching jails. (*Id.*)

Defendants also submitted an affidavit from James Wallace, Jr., who worked alongside Poe as an inmate trustee in the kitchen. (ECF No. 20-11, PageID.173.) Wallace avers that Poe never told him that any kitchen staff "did or said anything appropriate to him" nor did he personally witness a staff member "say or do anything sexually inappropriate" to Poe. (*Id.*)

Finally, Ogemaw County Lieutenant Doug Cassleman conducted a review of the allegations in Poe's complaint here. (ECF No. 20-22.) After interviewing at least six people who might have had knowledge of the conduct at issue, he concluded that Poe's complaint "could not be substantiated." (ECF No. 20-22, PageID.404.)

**II.**

Magistrate Judge Morris made several recommendations in response to Defendants' motion. To summarize, she recommended:

1. Dismissing Ogemaw County as a defendant;

2. Dismissing Poe's claim of intentional infliction of emotional distress, under 42 U.S.C. § 1997e(e);

3. Dismissing Poe's claim of sexual abuse of a ward, under 18 U.S.C. § 2243(b);

4. Dismissing Poe's claim of sexual assault, under 34 U.S.C. § 30301;

5. Dismissing Poe's official-capacity claims against Norman and Osier;

6. Dismissing Poe's request for injunctive relief;

7. Dismissing Poe's request for declaratory relief;

8. Declining to exercise supplemental jurisdiction over Poe's state-law claims;

9. Finding that Osier is entitled to qualified immunity on the Eighth Amendment failure to protect claim and granting his motion for summary judgment;

10. Finding that Norman is not entitled to qualified immunity on the Eighth Amendment sexual abuse claim and denying her motion for summary judgment;

11. And, finding that Plaintiff had exhausted administrative remedies and denying Defendants' motion to dismiss Plaintiff's constitutional claims.

(ECF No. 30, PageID.533–534.)

Defendants essentially object to both recommendations (and related findings) that were not in their favor: that Norman is not entitled to qualified immunity (#10) and that Poe exhausted administrative remedies (#11). (ECF No. 31.) While somewhat unclear, Poe's objections identify one distinct disagreement with the recommendations, disputing that Osier is entitled to qualified immunity (#9). (ECF No. 33.)

**III.**

Regarding those three objected-to portions of the report and recommendation, the Court performs a de novo review. *See* 28 U.S.C. § 636(b); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001). Regarding the other findings, the Court need not and does not take a fresh look. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Garrison v. Equifax Info. Servs., LLC*, No. 10-13990, 2012 WL 1278044, at *8 (E.D. Mich. Apr. 16, 2012).

In deciding a motion to dismiss under Federal Rule of Procedure 12(b)(6), the Court "construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "need not, however, accept unwarranted factual inferences." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The standard for summary judgment is different: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if its resolution will affect the outcome of the lawsuit." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451–52 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And a "dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (internal citations omitted). The Court views all facts and inferences in the light most

favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.

The Court will address the three objections in turn. First, the Court accepts the recommendation denying Defendants' motion to dismiss Poe's constitutional claims since Plaintiff exhausted administrative remedies. Second, the Court also accepts the recommendation denying qualified immunity to Norman. Finally, the Court rejects the qualified-immunity recommendation regarding Osier—finding instead that Osier is not entitled to qualified immunity and is not dismissed from the suit.

## A.

Defendants moved to dismiss Poe's suit because he did not exhaust administrative remedies. Magistrate Judge Morris disagreed, finding that Poe indeed had exhausted remedies and therefore could state a federal claim. The Court will adopt the magistrate judge's recommendation.

The question of PLRA exhaustion is frequently litigated. And both the Supreme Court and Sixth Circuit repeatedly have dissected the text of the statutory exhaustion requirement: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). And so prisoners must "adhere to the institutional grievance policy" before bringing a PLRA suit. *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). Failure to exhaust is an affirmative defense. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Does 8–10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

Under Sixth Circuit case law, courts must analyze "whether an inmate has made affirmative efforts to comply with the administrative procedures and whether those efforts to exhaust were sufficient under the circumstances." *Does*, 945 F.3d at 961 (internal quotation marks omitted) (quoting *Risher*, 639 F.3d at 240). "[W]hen a reasonable policy is in place, but is silent or vague in a particular circumstance, courts must look to see whether the prisoner has attempted to satisfy the requirements of the policy." *Napier v. Laurel Cty.*, 636 F.3d 218, 223 (6th Cir. 2011). For instance, the Sixth Circuit held that an inmate sufficiently complied with a prison's grievance procedure even though, contrary to the rules, he appealed a previous denial without including a copy of it (which officials never gave him). *See Risher*, 639 F. 3d at 240 (declining to "impose requirements on Risher for exhaustion purposes that go beyond what was *specifically required* by the Bureau's grievance procedure" (emphasis added)). But to be sure, "even when a policy is vague, a prisoner must do what *is* required by the grievance policy." *Napier*, 636 F.3d at 224 (holding that a prisoner did not exhaust remedies when he "simply chose not [to] file a grievance").

Defendants object specifically to the magistrate judge's finding that the grievance procedures were unclear and vague. In particular, they note that Poe's kites did not explicitly mention sexual abuse nor did Poe utilize emergency buttons that are available throughout the facility. (ECF No. 31, PageID.593.) Upon review, the Court concludes that Poe adhered to the Facility's grievance policy such that his efforts to exhaust were sufficient.

A look at the Facility's grievance policy shows that the text indeed is vague. The section titled "Inmate Grievance (Kites)," which is just 49 words, states: "Inmates shall use the cobra kiosk to send a kite. Kites can be sent to the classification officer, kitchen, Nurse, Program Coordinator or the (lieutenant) Jail Administrator. A grievance form can be obtained from a C/O. Once filled

out it shall be forwarded directly to the (Lieutenant) Jail Administrator." (ECF No. 20-14, PageID.207.)

Notably, this requirement does *not* require an inmate with a grievance to follow a certain procedure. Take each of the four sentences individually. The first sentence indicates that an inmate who wants to send a kite "shall use the cobra kiosk." Then, it gives a list of people who can receive such a kite. Third, the policy details where an inmate can obtain a grievance form—which appears to be different than sending a kite. And finally, the text states that the grievance form "shall be forwarded" to the jail administrator. But nowhere does the text spell out what an inmate must do in order to fulfill the grievance procedure. For instance, an inmate "shall use" a kiosk if he wants to send a kite, but there is no "shall" language that compels an inmate to file a grievance in the first place. Instead, the language passively indicates that a form "can be obtained" and that "it shall be forwarded" (although it is unclear who must do the forwarding). Further, the policy does not foreclose alternative ways of expressing a grievance. Under the plain text, an inmate could file a written complaint in many ways since a grievance form is not the exclusive means of complaining. The policy does not make clear whether the inmate must write down his complaint or whether he could merely verbalize it. Nor is there a requirement that he must make his grievance to any particular person (although the jail administrator must receive a copy).

By comparison, consider the language in the policy of a different corrections facility: "A grievance shall be made in the form of a written statement by the inmate promptly following the incident, sealed in an unstamped envelope and addressed to the Jailer or his designee." *Napier*, 636 F.3d at 222 (quoting the policy of the Laurel County Detention Center). The rule adds: "[S]uch statement shall be transmitted promptly and without interference to the Jailer by a detention officer or staff member to whom the grievance is given." *Id.* at 222–23. The Court notes the relative clarity

of that policy's mandatory "shall" language as well as the specific directions of how to address and send the written statement.

Defendants' objection is somewhat puzzling. They say: "The Jail Rules contain various options for reporting offensive behavior or sexual assault, *none of which reference a grievance policy*, but all of which involve a two-part process, and none of which were followed by Plaintiff, as broken down and identified below[.]" (ECF No. 31, PageID.592 (emphasis added).) The objection adds: "Further, as identified on the grievance form, inmates are permitted to appeal grievance decisions to the sheriff or his designee." (ECF No. 31, PageID.594 (citing ECF No. 20-16, PageID.216).) To reiterate, Defendants acknowledge there is no formal grievance policy for reporting sexual misconduct; yet, they point to two other portions of their guidelines. First, they note one section titled "Prevention," which includes the sentence, "Report any and all offensive behavior to any staff verbally and through the kite system." (ECF No. 31, PageID.592– 593 (citing ECF No. 20-14, PageID.196).) Second, a portion titled "Reporting Sexual Assaults" indicates that inmates "should verbally report" sexual assaults to staff and that an emergency button in each pod "should be utilized" if an inmate is the witness or victim of sexual assault. (ECF No. 31, PageID.593 (citing ECF No. 20-14, PageID.197).) Defendants assert that Poe never sent a kite that reported "offensive behavior," merely a request to talk. (ECF No. 31, PageID.593.) Nor did Poe press any available emergency button. (*Id.*)

The Court overrules this objection. Defendants simply do not point to requirements of their grievance policy that Poe failed to exhaust. Instead, they fault Poe for not using certain language in his kites and for failing to press an emergency button. But the Court cannot say Poe did not try to comply with the requirements.

To start, Poe reported Norman's alleged offensive behavior both verbally and through the kite system (by requesting a meeting with Osier rather than spelling out in writing what had happened). Poe told Osier in a face-to-face conversation that Norman was "getting very friendly with her mouth" and "too touchy." And while the rules do state that an emergency button "should be utilized" by a sexual assault victim, that language is far from a requirement that an inmate must do so if he wants to fulfill the Facility's grievance policy. Finally, a policy that "inmates are permitted to appeal" a decision merely allows, rather than requires, inmates to do so. These extra steps suggested by Defendants "go beyond what was specifically required by the [Facility's] grievance procedure." *See Risher*, 639 F.3d at 240; *see also Goebert v. Lee Cty.*, 510 F.3d 1312, 1323 (11th Cir. 2007) ("If we allowed jails and prisons to play hide-and-seek with administrative remedies, they could keep all remedies under wraps until after a lawsuit is filed and then uncover them and proclaim that the remedies were available all along.").

The Court also questions whether the Facility's grievance policy was so "opaque that it becomes, practically speaking, incapable of use" such that it is not an "available" remedy that a prisoner must exhaust. *See Does*, 945 F.3d at 963 (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016)). The relevant section of the policy is confusingly titled "Inmate Grievance (Kites)," which raises the question: Are kites a type of grievance or something else? In this litigation, Defendants say that Poe's kites did not count as grievances, but such a reading would make the policy even more opaque. However, this issue need not be reached.

Here, it is sufficient to find that Poe adhered to the Facility's institutional grievance policy and made affirmative efforts to comply with those procedures in a manner that was sufficient under the circumstances. *See id.* Even if the Facility had put "a reasonable policy in place" overall, the guidelines are "silent or vague in [this] particular circumstance." *See Napier*, 636 F.3d at 223.

11

According to Poe, he sent multiple kites to Osier saying that they needed to talk and then the two of them spoke in person. At that meeting, Poe reported to Osier that Norman was "getting very friendly with her mouth" and "too touchy." No more was required. Since Poe "adhere[d] to the institutional grievance policy," *Risher*, 639 F.3d at 240, Defendants have not shown that every reasonable jury would find that Poe failed to exhaust remedies.

**B.**

Next, Norman objects to the recommendation that she is not entitled to qualified immunity on Poe's Eighth Amendment claim.[1] For reasons discussed below, the Court adopts the magistrate judge's finding that Norman is not entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to defeat a defense of qualified immunity, the plaintiff must establish (1) that the defendant violated a constitutional right; and (2) that the right was "clearly established" at the time of the violation. *Crosby v. Univ. of Ky.*, 863 F.3d 545, 552 (6th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). District courts may perform that analysis in either order. *See id.* (citing

---

[1] Although Poe brought his claim under the Eighth Amendment—and both the Defendants as well as the magistrate judge analyzed his claim that way—the case could be more properly considered a Fourteenth Amendment suit since Poe was a pretrial detainee. *See, e.g.*, *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015). This does not affect the analysis, though, because the Fourteenth Amendment due process rights of a pretrial detainee in jail "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Phillips v. Roane Cty.*, 534 F.3d 531, 539 (6th Cir. 2008) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). And in *Rafferty v. Trumbull Cty.*, 915 F.3d 1087 (6th Cir. 2019), which is discussed below, the Sixth Circuit similarly used an Eighth Amendment standard in the context of qualified immunity even though the plaintiff had been incarcerated in jail rather than prison.

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "In assessing . . . immunity at the summary judgment phase of the case, [courts] give the plaintiff the benefit of all reasonable factual inferences from the record, asking only whether the officers are entitled to judgment as a matter of law." *Krause v. Jones*, 765 F.3d 675, 678–79 (6th Cir. 2014).

Last year, the Sixth Circuit summarized the case law regarding qualified immunity and Eighth Amendment prisoner suits in *Rafferty v. Trumbull County*, 915 F.3d 1087 (6th Cir. 2019). To establish that a defendant violated the Eighth Amendment, a plaintiff must satisfy both objective and subjective components: that the harm was "sufficiently serious" and that the official acted with a "sufficiently culpable state of mind," respectively. *See Rafferty*, 915 F.3d at 1094 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Regarding the objective prong, "[f]ederal courts have long held that sexual abuse is sufficiently serious to violate the Eighth Amendment" when perpetrated by a guard or another inmate. *See id.* at 1095. That said, verbal abuse alone may not constitute sufficiently serious infliction of pain. *See, e.g.*, *Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004). To satisfy the subjective prong, an officer who cannot "conceivably offer a legitimate penological justification" for her actions has acted with the requisite deliberate indifference or malice. *See Rafferty*, 915 F.3d at 1096.

In *Rafferty*, the Court denied qualified immunity to a male corrections officer who allegedly committed sexual abuse against a female inmate. *See id.* at 1095–97. The corrections officer demanded that the inmate expose her breasts three or four times, and he once or twice asked her to masturbate in his presence. *See id.* at 1091. The Court held that the officer's "repeated demands that [the inmate] expose her breasts and masturbate are 'sufficiently serious' to implicate the Eighth Amendment under settled case law from the Supreme Court, this Circuit, and numerous

other courts of appeals." *Id.* at 1095. The plaintiff also met the subjective component because the defendant had no legitimate penological justification for his repeated sexual advances. *See id.* at 1096.

*Rafferty* acknowledged that instances of sexual harassment that are "isolated, brief, and not severe" do not rise to an Eighth Amendment violation. *See id.* at 1095. But because there were "up to six occasions" where the officer demanded sexual contact, the case was distinguishable. *See id.* The Court went on to consider some unpublished cases cited by the corrections officer holding that some episodes of sexual harassment did not implicate the Eighth Amendment. *See id.* at 1095 n.2. But in those examples, by contrast, there was no Eighth Amendment violation because the conduct was less "severe and/or pervasive." *See id.* (citing *Ragland v. City of St. Louis*, No. 12-1334, 2013 U.S. App. LEXIS 14686 (6th Cir. Feb. 11, 2013) (one instance of sexual touching); *Violett v. Reynolds*, 76 F. App'x 24 (6th Cir. 2003) (offering sexual favors to inmate); *Johnson v. Ward*, 215 F.3d 1326 (6th Cir. 2000) (Table) (one instance of sexual touching and one sexual remark)).

The magistrate judge found this case to be similar to *Rafferty* and recommended denying qualified immunity to Norman. In their objection, Defendants rely primarily on three unpublished Sixth Circuit cases in which an official was granted qualified immunity: *Ragland*, *Violett*, and *Johnson*. But as *Rafferty* noted in distinguishing those cases, the allegations in *Ragland* and *Johnson* consisted of just one instance of sexual touching while *Violett* was not about touching at all. *See Rafferty*, 915 F.3d at 1095 n.2. Whereas the facts in those cases were more in line with "isolated, brief, and not severe" harassment, *Rafferty* held that a constitutional violation existed when there were multiple instances of demands for sexual touching. *See id.* at 1095.

Here, viewing the evidence in the light most favorable to Poe, there were three instances of sexual touching. At various times Norman grabbed Poe's butt and rubbed near his penis, she placed Poe's hand on her breast and rubbed his penis, and she rubbed her hand inside her own pants and then rubbed near Poe's penis. This conduct was not merely "isolated, brief, and not severe." Taken together, these three occasions—not including the incidents when Norman verbally expressed her sexual desires to Poe—fit the *Rafferty* standard. So since a reasonable jury could find that the sexual abuse was sufficiently serious, Poe has satisfied the objective component of his Eighth Amendment Claim. And because a reasonable jury could find, again taking the facts in the light most favorable to Poe, that Norman, plainly, had no legitimate penological justification for her repeated sexual advances, the subjective component also has been met.

Finally, the Court considers whether this constitutional right was "clearly established" at the time of the incidents, between March and June of 2017. The relevant question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 1097 (quoting *Saucier*, 533 U.S. at 202). The Supreme Court "does not require a case directly on point if existing precedent has placed the statutory or constitutional question beyond debate." *Id.* (alterations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Norman argues that her conduct did not violate a constitutional right that was clearly established. But *Rafferty* concluded that by early 2014—three years before the incidents here—"it was clearly established that sexual abuse of prisoners could rise to the level of an Eighth Amendment violation." *Id.* The Court cited several cases that stood for this proposition. *See id.* (citing, *e.g.*, *Washington v. Hively*, 695 F.3d 641, 642 (7th Cir. 2012) (plaintiff presented evidence that guard "gratuitously fondl[ed]" the plaintiff's penis and testicles during a search); *Schwenk v. Hartford*, 204 F.3d 1187, 1198 (9th Cir. 2000) (holding that reasonable officer could not have

believed it was lawful to "unzip his pants, expose himself, demand oral sex, and then, after being refused, grab the prisoner, push her up against the bars of the cell, and grind his naked penis into her buttocks")). Like those cases and others, the precedent was well-established before 2017 that sexual abuse violates the Eighth Amendment when it is more serious than "isolated, brief, and not severe" instances. And it would be clear to any reasonable officer that such conduct was unlawful in this situation.

In conclusion, Defendant Norman has not shown the absence of a fact issue required for summary judgment. She argues that Poe's allegations are not credible, pointing, for example, to Poe's claim that she called him from home on his birthday even though she alleges she worked that day. And Defendants also submitted an affidavit from another inmate trustee who said he never witnessed any kitchen staff act in a sexually inappropriate way with Poe. But such determinations of credibility and findings of fact are for a jury at a trial, not for the Court. Norman is not entitled to qualified immunity, and Poe's Eighth Amendment claim against Norman survives summary judgment.

## C.

Poe's Eighth Amendment claim against Osier, the jail administrator, is that Osier failed to protect him from Norman. The magistrate judge recommended granting summary judgment for Defendant Osier on the basis of qualified immunity. Poe now objects, writing that "Osier took no action" after he informed Osier of Norman's actions. (ECF No. 33, PageID.656.)

"To establish a constitutional violation based on failure to protect, a prison inmate first must show that the failure to protect from risk of harm is objectively 'sufficiently serious.'" *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 833). "[A] plaintiff also must show that prison officials acted with 'deliberate indifference' to inmate health or safety." *Id.*

(quoting *Farmer*, 511 U.S. at 834). An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 766–67 (quoting *Farmer*, 511 U.S. at 837).

As discussed above, Poe has met the "sufficiently serious" prong for the purposes of surviving summary judgment. So the remaining question is whether Osier acted with deliberate indifference to Poe's health or safety. Osier argues that no reasonable jury could find that he was deliberately indifferent.

The Court disagrees. A reasonable jury could conclude that Osier was aware of facts that could have led him to draw an inference of a substantial risk of harm, that he did in fact draw that inference, and that he disregarded that risk.

Take the first part of the deliberate indifference test: knowledge. The content of the kites is not disputed. That is, the parties agree that Poe wrote Osier that he needed to talk in private to discuss some things. What is disputed is the substance of the conversation that took place on May 12, 2017. According to Poe, he told Osier that Norman was "very friendly with her mouth and body lan[g]uage towards him and too touchy." In response, Osier said Norman "means no harm," Poe was "enjoying it," Poe would "be fine," and he was not "the first inmate she's gotten fresh with." Osier disputes that Poe complained about any sexually inappropriate conduct. Rather, Osier says the conversation regarded Poe's facility placement.

On summary judgment, the Court must view the facts and inferences in the light most favorable to Poe. Under that standard, there is a genuine dispute whether Osier was aware of facts from which he could infer that Poe faced a substantial risk of harm and that he drew that inference. If Osier heard from Poe that Norman was "too touchy" and "very friendly" with her mouth and

17

body language, a reasonable jury could find that Osier was aware of the sufficiently serious sexual abuse.

Osier's response, particularly that Poe was "enjoying it" and that Norman had "gotten fresh" with other inmates as well, shows that he might have inferred an excessive risk to Poe's health or safety. One definition of "fresh" is "presumptuous or impudent toward someone, especially in a sexual way." *Fresh*, New Oxford American Dictionary (3rd ed., rev. 2015). By comparison, some other dictionaries do not include a sexual connotation. *See Fresh*, American Heritage Dictionary (5th ed. 2018) ("Bold and saucy; impudent"); *Fresh*, Merriam-Webster Unabridged (rev. 2020) ("disposed to take liberties: saucy, impudent, impertinent, rude"). Whether Osier meant to suggest that Norman had been presumptuous in a sexual way or just plain impudent and rude, his comment in response to allegations that Norman was "too touchy" and "very friendly" with her mouth could show that Osier was aware of Norman's sexual conduct.[2]

On these facts, a jury could find that Osier not only was aware of a substantial risk of harm but also that he disregarded it. He laughed at the allegations and took no preventive steps to ensure that Norman would change her conduct. And his comments to Poe that he would "be fine" and that Norman "means no harm" could indicate an indifference to Poe's complaints, excusing Norman's behavior and minimizing Poe's safety concerns. Although Osier claims that Poe never discussed accusations of sexual misconduct with him, that is a fact issue that must be resolved at trial.

---

[2] In the magistrate judge's view, Osier might have assumed that Norman was acting inappropriately but not in a sexual way. (ECF No. 30, PageID.572.) The report and recommendation defined "fresh" to mean "being too confident and showing no respect, or showing by your actions or words that you want to have sex with someone." (*Id.* (quoting *Cambridge Dictionary* (Online ed.)).) But if Osier used the word "fresh" as in the meaning described in the second part of that definition—"showing by your actions or words that you want to have sex with someone"—then it would be hard to mistake the sexual nature of the conduct reported by Poe.

The "clearly established" nature of this right is not in serious dispute. At the time of the events here, a reasonable official would have understood that such deliberate indifference would be an Eighth Amendment violation. *See Bishop*, 636 F.3d at 766 ("[T]he constitutional right to be free from deliberate indifference to assault and sexual abuse was clearly established at the time of the alleged constitutional violation [in 2004].").

In conclusion, a reasonable jury could find that Osier failed to protect Poe by being deliberately indifferent to his sufficiently serious risk of harm, which was a clearly established right in early 2017. The Court sustains Poe's objection and finds that Osier is not entitled to qualified immunity. Osier's motion for summary judgment is denied.

**V.**

To summarize, the Court SUSTAINS Poe's objection to the recommendation that Osier be entitled to qualified immunity. In all other respects, the objections are OVERRULED and the report and recommendation is ADOPTED. Ogemaw County is DISMISSED.

The Court DENIES the motion for summary judgment regarding Poe's Eighth Amendment claims against Norman and Osier, which will proceed to trial. All other claims are DISMISSED.

The extensive briefing on the dispositive motion and resulting objections, the lack of clarity in Plaintiff's objections, and the Magistrate Judge's and this Court's lengthy and substantive opinions in connection with the dispositive motion all suggest that circumstances have changed since Poe's initial request for counsel. The Court believes that, given the current posture, this is a case for which Poe, the Defendants, and the Court would benefit from the assistance of pro bono counsel. So Poe's renewed motion for counsel (ECF No. 37) is GRANTED. The case will be stayed for a reasonable period of time while the Court attempts to obtain pro bono counsel. If

unsuccessful, the Court will lift the stay and plaintiff will proceed *pro se*. If successful, the Court will schedule a status conference with counsel to discuss remaining trial and pretrial dates.

Finally, the Court has not considered Plaintiff's recent letters in ruling on these objections. So Defendants' motion to strike (ECF No. 40) is DENIED AS MOOT. If pro bono counsel is obtained, all future filings should come from that counsel. If not, Plaintiff is advised that all requests seeking action from the Court must be made by motion.

SO ORDERED.

Dated: March 4, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 4, 2020.

s/Erica Karhoff
Case Manager to the
Honorable Laurie J. Michelson